Thank you. Good morning, Your Honors. May it please the Court, I am Mike Rodenbaugh. I'm appearing with Aaron Vivian. We are with Rodenbaugh Law, and we represent the plaintiff and the appellant, Zero Motorcycles, Inc. And you've got 15 minutes. We'd like to reserve five of that for rebuttal, please. Thank you. Your Honors, we believe this case was largely decided with respect to specific personal jurisdiction in the year 2000, in the Bancroft and Masters decision written by Your Honor Judge Schroeder. There's no relevant difference between the Masters Golf Tournament's notice in that case to the declaratory judgment plaintiff's Masters.com domain name registration, which threatened that intellectual property, versus the notices in this case by Pirelli to the USPTO, which threatened Zero Motorcycles' trademark registrations. Both notices were filed with institutions in Virginia. Both notices had a direct effect expressly aimed at the declaratory judgment plaintiffs here in this district. In both cases, the trademark owner threatened a California company with trademark infringement claims, clouding title to valuable, critical in our case, intellectual property, and forcing the plaintiffs to respond with legal actions in order to defend their IP rights. These actions, the effects of those actions are felt here by my client in this district, where it maintains its principal place of business, its headquarters, virtually all of its employees. Therefore, as in Bancroft, this Court should find specific personal jurisdiction in this case and remand the matter for further proceedings. We also believe this case was decided as a general personal jurisdiction, essentially, in 2011, in the Baumann decision. Again, we find no relevant difference between the Daimler Chrysler situation and with its subsidiary, Mercedes-Benz subsidiary, in that case. In Baumann, I believe the opinion noted that 2.4 percent of the gross sales of DCAG were by way of MBUSA in California, correct? That's correct, Your Honor. Here, as I remember the statistics, they're quite different. Pirelli worldwide sales in North America are 8 percent, right? Correct. Worldwide net sales, whatever net sales mean. But that's net sales. Eight or nine percent, depending on the year. And this was in 2008 or 2009. That's North America, right? That's U.S. and Canada, yes. U.S. and Canada and Mexico? No. North America? North America, well, I'm not sure. The last time I saw the equator, it was south of Mexico. Fair enough. If one adds the population of Mexico, Canada and the United States and divides that into California, you get the net sales of Pirelli at 0.64 percent in California. Do you consider that to be similar to Baumann? Well, yes, Your Honor, absolutely. How about 0.01 percent? Would there be any – if Pirelli sold a tire in California, would that be sufficiently important so that they would have to have an agency relationship for sales rather than a franchisee relationship or perhaps a distributorship relationship? What evidence is there in this record from anyone who seems to be comfortable with a business model analysis to say that sales have to be – it's sufficiently important to Pirelli to have Pirelli do it if it didn't have a subsidiary do it? Well, we're talking about tens of millions of dollars minimum per year. Where is that in the record, please? Sales of California, tens of millions of dollars? It's only by extrapolation, just as Your Honor has done with statistics. You do extrapolation. Give me tens of millions of dollars at 0.64 percent. Correct. What is the gross volume of Pirelli sales and tires? Billions of dollars. Is that because you say so? No, that's in the financial statements. And then we extrapolate the 8 percent like Your Honor did. And then multiply that by 8 percent, which is what the amount of Californians as compared to North American population, and you get 0.64 percent. I didn't include Mexico, but, yes, I came to it more like Mexico. I was going to be very upset to learn they're not North America. Your Honor, I really don't wish to belabor the point as to the amount of revenues, the specific percentage. Well, what is the minimum amount of revenues which you think is necessary so that we, three black-robed individuals, can determine that the business is sufficiently important, based on Pirelli's business model, that Pirelli would have to do agency sales rather than distributorship sales or franchisee sales? Tell me. What's the evidence on that? I don't believe there's a black line that you can draw as to the percentage of revenues. Any kind of a line that we can use? I can just say that, for example, in the LSI case from the Federal Circuit in the year 2000, they held that millions of dollars was sufficient to hold for continuous and systematic contact. And where in the record can I satisfy myself that Pirelli sells millions of dollars of, what is it, tires? Tires, yes. In California, through its subsidiary? Simply by extrapolation, as I've discussed. By extrapolation from Pirelli's financial statements? Can you give me a record citation, if you would, please? I can, Your Honor, yes. I have that right here. The financial statements are specifically ñ I thought I had that right here. Is it your general principle, then, that once any company sells millions of dollars of its product in California, it is subject to general jurisdiction in California? Think about that for a moment. I would say general, yes, Your Honor, but in this case there's quite a bit more. And I would focus on the license agreement between the parties in particular and on the financial control that the parent exercises over the subsidiary in particular. I interrupted. You were going to give me a record citation? Yes, I'm sorry. I believe the record citation to the financial statements is at 438, 439. ER 438, 439? Yes, sir. Thank you. Pardon me for interrupting you. The discussion you've been having with Judge Bea refers to the general jurisdiction argument, isn't that right? That's correct. Would you say a word or two about the specific jurisdiction? Gladly, Your Honor. With respect to specific jurisdiction, it's very clear that the actions, the jurisdictionally significant actions in this case, were the filing of the petitions to cancel Xero's trademarks, federally registered trademarks at the USPTO, similar to in the Bancroft and Masters case where the declaratory judgment plaintiff had a domain name registration for valuable intellectual property, the masters.com domain name. That also was sent to the domain name registrar in Virginia, but the court held that it had its express aim was to essentially tie up that property and cause competitive issues with the declaratory judgment plaintiff here. The district court said that this was really aimed at the patent and trademark office. Was that argument really developed in the masters case? Yes, I believe it was, Your Honor. The court also discussed that issue, in your opinion, as a matter of fact. It wasn't a very long discussion of it in that opinion, but there was at least a paragraph or so about it. And the court, this court held that clearly the action, although sent to NSI Network Solutions in Virginia, was expressly aimed at the owner of the intellectual property here in California. And the only way that Pirelli attempts and the way that Judge Armstrong distinguished the two cases was by arguing, as you noted, that the actions were aimed at the USPTO. But that's really not looking at the reality of the situation. While they are attacking plaintiff's registrations at the USPTO, they're also attacking plaintiff's use of its marks. The TTAB, of course, is not the final word in a trademark dispute. It's really just round one, and it only addresses registrability of the marks. Either party can challenge the TTAB's findings in district court, which will then review the matter de novo. So in this case, as in others ---- Wouldn't it be more effective to have all these proceedings back in Virginia where the registration takes place? Well, no, Your Honor. Virginia, other than being the situs of the USPTO, and believe me, I was at a conference with the USPTO yesterday. Their examining attorneys are all over the country now. But anyway, just because they send a copy of the notice, filing it online, it ends up in a depository in Virginia, it's still ---- it served on my client here in Scotts Valley the harm, the actions that they have to take to get their board of directors involved, notify their investors, et cetera, et cetera. All that happens here at their headquarters. Isn't USPTO going to open up a Silicon Valley office? They are. That's correct, Your Honor. Department of the Pratt for patents. Let me ask. The judge dismissed the case for lack of personal jurisdiction on July 18th, 2011. Is that right? Yes, Your Honor. Was that dismissed, I assume, without prejudice? Personal jurisdiction? I'm not sure, Your Honor. I don't know that it really matters for the purpose of my question. Then about a year later, you brought a Rule 60B motion. In September 15, 2011, we received a notice from Mr. Hefter, essentially a de facto cease and desist notice, saying that no longer would they not only not tolerate registration of our marks, but would not tolerate use of any zero formative marks. You latch onto that as showing their connection to California. I do. Now, my question is, rather than pursuing a Rule 60B motion, why couldn't you just start another lawsuit? It's still an option, I suppose, Your Honor. Given that this appeal is pending, given that there's already quite a developed record. I mean, maybe you win the appeal, maybe you lose the appeal. I don't understand why you just don't go down and file another. I believe that's still an option. But, you know, I imagine Parley will raise the same arguments. So it doesn't really get us anywhere. Well, if it doesn't get you anywhere, then your motion would have been valid. But, I mean, what I'm saying is you now have some proof that they are acting in California, according to you, you know, specific proof that they really are present here doing things in California. I was just sort of puzzled why here we are two years later worrying about. Well, Your Honor, there was jurisdictionally significant harm merely by filing the petitions to cancel in the trademark office. They didn't pick it up another notch by threatening our use, which they represented to the district court specifically that they had not done. And the district court appeared to rely fairly heavily on that fact. She did mention it in her opinion. And so, therefore, once we got that evidence, you know, which, you know, we always understood to be the case. I mean, again, the trademark office filings really creates this sort of Damocles. They're threatening us with infringement. They're saying our marks are likely to be confused. Yet they're only in the TTAV now. They can be in Federal court any minute, any day of the court where they choose. Our client's small. They're located here. You wanted to reserve some time, and I see you're down to three. Thank you. Thank you. Mr. Hefter, you have the floor. Now, since you can't see the clock, would you keep an eye on the time, please? You've got 15 minutes. Thank you, Your Honor. Yes, in fact, I have a clock in front of me. And I just want to thank the court for accommodating my travel plan. I apologize for that. This case, as has been discussed, this case arises out of Pirelli, and I'm talking about the Italian company to differentiate from the U.S. subsidiary, filing an administrative proceeding in the trademark office in Virginia, an opposition and a cancellation. Now, when Xero, the appellant, filed its applications to registers of trademark, it knew that it could be subject to the proceedings in the trademark office. The trademark office, indeed, is the only place authorized to handle oppositions and cancellations, and the office is given that authority by the Lanham Act. Now, unlike the cases cited by Xero, this case does not involve a contract. It does not involve a tort. Pirelli has, contrary to what counsel has just said, Pirelli has not accused Xero of infringement. Pirelli has not accused Xero and contend that Xero must stop using the mark. Pirelli has not been accused of violating any rights of Xero. It's merely an administrative proceeding that is handled when applications are filed in the trademark office. If Xero is correct, that is, that it's entitled to a registration, it will get it. If Xero is denied the registration, then it means it's not entitled to the registration, so harm is not being done. The trademark office has no authority to award damages or to enjoin use. It's strictly, are they entitled to a registration? And Xero has the right of appeal. There is an alternative court that they can go to. The Lanham Act specifically covers that foreign parties, i.e., the Italian Pirelli here, when it files an opposition or a cancellation proceeding in the trademark office, it subjects itself to jurisdiction before either the Court of Appeals for the Federal Circuit or the district court in D.C. So there is a court to which Xero has a right of appeal if it loses at the trademark office. Now, Xero seems to focus primarily on specific jurisdictions, and it contends that this case is very much like Bancroft. And I do agree, of all the cases cited, and there was something like 83 cases that have been cited here, Bancroft probably is the closest. But in Bancroft, first of all, Bancroft involved a cease and desist letter. There is no such letter here. There was a letter to NSI to institute a dispute resolution over a domain name. That letter forced B&M, forced Bancroft and Masters, that if it wanted to preserve its right in a domain name, it had to file a lawsuit. Also, they were accused, A&R was accused of wrongful interference with the use and misappropriation of the name. None of those facts exist here. Mr. Hechter, this is Silverman. After the case was dismissed, did you folks send a cease and desist letter to Xero Motorcycles? No, Your Honor. What happened after the case was dismissed, counsel for Xero sent an offer to settle this whole dispute, and that offer had various terms in it and included worldwide resolution. Because this problem is not only in the United States, but as the record shows, the parties are disputing the situation worldwide. So we basically rejected the settlement offer. And part of that settlement offer that was made to us was that Xero would have the right to use the mark. But the rejection said, we reject your settlement offer, which included all those terms. This is not a cease and desist letter. We never sent a cease and desist letter. Now, with regard to the Fowlman case, the Fowlman case is very, very different. In the Fowlman case, it was shown that Daimler and Chrysler had extensive control over the subsidiary. They controlled the amount of sales they required of its subsidiary per year. It controlled the resellers that the subsidiary used. It had to approve the business system. It had to approve warranty terms. It goes on and on. And, indeed, they set the prices that their subsidiary could sell the product. That's exactly the opposite of what we have in this case. The record is very clear on that. Mr. Heffter, let's get back to specific jurisdiction. Here, your action before the Virginia Trade Office, doesn't that affect the business of Xero in Scotts Valley, California? No, Your Honor. Why? The only thing that the action does is it asks the trademark office to determine whether or not Xero is entitled for registration. It has nothing to do with their business. If the trademark office determines that Xero is not entitled to a registration, that does not mean Xero cannot continue to use the mark. The trademark office has no authority to enjoin use of the mark. It simply says they're not entitled to a federal registration. Why has Pirelli gone to the trouble of bringing an action in Virginia if it doesn't really affect Xero at all? Well, all it does is it raises the issue of whether Xero is entitled to a federal registration. That's done for many reasons. First of all, Pirelli has several Xero registrations. Xero is a very valuable mark to it. And if the trademark register has many other Xero marks registered... Are you saying that Xero can ignore your action in Virginia with impunity to its business? They can continue to use the mark with impunity to our business. Now, if their use of the mark is such as to cause confusion with the public, then, of course, Pirelli could bring an infringement action, but that's not the situation right now. This is Judge Schroeder. Isn't the proceeding in Virginia, isn't that the predicate for bringing an action? No, Your Honor. One thing has nothing to do with the other. Pirelli could ignore the trademark office completely and could bring a trademark infringement action if it wanted to. One has nothing to do with the other. Infringement has to go to the federal court or the state court. But the right to a registration when an application is pending, that goes to the trademark office. But what advantage does a registration, one way or the other, give you in an infringement action? It has... Well, a registration gives certain presumptions of... Ah, so there's something to it. There's some advantage that Pirelli gets by winning the registration and that Xero loses by losing the registration, true? Not quite, Your Honor, because the opposition proceeding that Pirelli has brought has nothing to... They're not going to win. They already have their registration. What Pirelli is saying is that Xero is not entitled to have its application mature into a registration. Pirelli already has its registration. Let me ask you this. Does it make any difference in an infringement action who has a registration and whose registration is canceled? The only difference is the presumptions that are drawn from the registration. Presumptions help in lawsuits from time to time, do they not? Absolutely, Your Honor. And they hurt from time to time. And they certainly could. And definitely the presumption that Pirelli would have because of the registrations that it now has... So there's something in play in Virginia, right? What's in play in Virginia is whether Xero has the right to get a federal registration. What's not in play is whether Xero has the right to use the marks. All right, thank you. Okay. And one thing I believe that's very important is that if specific jurisdiction is found, it means that any time a foreign company files an opposition in the trademark office, it is subjecting themselves to potential jurisdiction any place in this country where the applicant that they're opposing is located. If that's the case, why did Congress pass the statute, 15 U.S.C. 1071, which specifically says that a foreign company is subject to jurisdiction of the Court of Appeals for the Federal Circuit or the District of the District of Columbia?  I think we understand that point. Let me go back to a question that was asked to your adversary. Was the district court's dismissal here effectively without prejudice? Your Honor, I don't know the answer to that. I'm sorry. So you don't know whether if circumstances changed under your position they could bring another action? If circumstances changed, I would presume they could bring another action. Yeah. Okay. I don't believe that there was anything in the opinion that dealt with that subject. Okay. With regard to general jurisdiction, what Xero has done throughout its papers, it has taken the actions of a subsidiary and has just automatically assumed that those are the actions of the Italian company. It's well known that simply because a company owns 100 percent of a subsidiary, that does not mean that that gives jurisdiction to the parent. There needs to be a lot more than that. There needs to be an element of control. The record is clear, abundantly clear, that the Italian Pirelli do not have that element of control over the U.S. subsidiary. And I refer you to the two declarations that have been filed under oath, the GNSE and the Rosenzweig Declaration. They can be found in the record at 264, 266, 267. For example, Xero says that the Italian Pirellis control the prices that are charged by Pirelli U.S. But the GNSE Declaration and the Rosenzweig Declaration specifically say exactly the opposite. Statements are made, and we have gone through, and in our brief, Your Honors, we point out where the statements made by Xero as to the control that Pirelli, Italian Pirelli, supposedly has over the U.S. company, the record does not support that. In fact, the record in most cases is the opposite. Further proof of the independence of the Pirelli U.S. is the trademark license that counsel for Xero alluded to. That trademark license is an onslaught transaction. It's a non-exclusive license. The U.S. company pays royalties based on its sales. If Pirelli U.S. was the alter ego or the agency or one in the same the way Xero tries to paint them, why would they have a non-exclusive license? Why would they be paying the royalties upon the sale? The whole situation is very different from something of the nature of the Bauman and Donald Chrysler case. Mr. Hefter, you've got about two minutes left, so if you'd wrap it up, I'd appreciate it. Well, Your Honor, I think unless there are any other questions, I think that's pretty well covered. Okay. Thank you very much, Mr. Runbaugh. Back to you. You've got the last word. Thank you, Your Honor. First, just touching briefly on the general jurisdiction arguments that Mr. Hefter was making, the record does show at ER 383 and 398 in particular financial control by the parent company over the subsidiaries, absolute financial control. It raises a triable issue of fact because they use the word control. Absolutely. You know, and all factual disputes need to be resolved in our favor. Does control directly or indirectly? What does indirect control mean for purposes of general jurisdiction? I believe that control is direct, even if it may go through several different subsidiaries. They're all wholly owned by the parent holding company. They control everything. That's your assertion? Absolutely, Your Honor. What's the evidence? Well, the evidence is written in the parent company's financial statements. They say we must comply with European regulations. We approve every transaction over 500,000 euros. There's several different ways that they control. The license itself also is very important at extended records 7055 to 765. It's not, you know, it is a fairly standard trademark license, but it clearly endures to the exclusive benefit of Pirelli in Italy. The subsidiaries must use technical specifications of Pirelli. All the products must be approved by Pirelli. In Article 9, there's a whole bunch of other strict restrictions on the licensee's use, all subject to Pirelli's inspection and control. Specifically, Article 11 is called inspection and control. So, you know, in this case, it's very clear that there's unity of interest between the parent and sub and that the sub acts as an agent of the parent. If not for the subsidiary, Pirelli would still be selling tires, distributing tires here in California. We all know that. Okay. As to specific jurisdictions, since I only have a minute and it's quite important, it seems that Pirelli is really arguing that we should have exhausted an administrative remedy at the TTAB. But that doctrine does not exist. That's the Rhodes case from 2007 from this Court. It's very clear that the two types of that matters are very different. Infringement proceeding in district court has a whole bunch of other issues, not just presumptions, but ability for willful damages if you have a registration, attorney's fees, et cetera. And the district court looks not only at registrability, what it says in the respective parties' registrations and applications, but how the marks are used in the marketplace. And, therefore, it's a much broader context. Zero is entitled to have this uncertainty over its core brand, its most important asset, resolved as expeditiously as possible without having to go through TTAB registrability proceedings, which, by the way, they already did, Your Honors. They got their marks registered. And then Pirelli came and tried to cancel them. Thank you, Mr. Rundrup. Mr. Hefter, thank you for participating by phone. The case just argued is submitted. Good morning. Thank you very much, Your Honor. Thank you.
judges: Schroeder, Silverman, Bea